## Hamilton v. Commonwealth.

February 28, 1947.

Rehearing denied April 25, 1947.

Edward P. Hill, Judge.

Fred K. Cope for appellant.

Eldon S. Dummit, Attorney General, and Guy H. Herdman, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

Appellant, Kirby Hamilton, was convicted in the Knott circuit court of maliciously cutting and stabbing Alonzo Amburgey with a sharp knife, a deadly weapon, with intent to kill him, but from which he did not die. The punishment inflicted by the jury was five years' confinement in the penitentiary. Appellant's motion for a new trial was overruled and from the judgment pronounced on the verdict he prosecutes this appeal.

But three grounds are incorporated in the motion for a new trial, which are, (1) error in instructions, (2) incompetent evidence introduced by the Commonwealth over defendant's objections, and (3) the verdict is not sustained by the evidence.

Counsel for appellant, in his brief filed in this court,

abandoned altogether ground (1), since no reference whatever is made therein to that ground. Therefore under a well established rule in this court it will not be discussed, further than to say we have examined the instructions and discover no defect therein; also that they submit every issue which the testimony in the case warrants.

For an understanding of the case it will be necessary in disposing of grounds (2) and (3)—the only ones discussed in brief of counsel—to make a brief statement of the facts. The offense was committed on the night of March 29, 1945, immediately in front of a restaurant known as the Rainbow Tavern owned by Tony Combs and located on Breedings Creek in Knott County, a short distance from the line separating it from Perry County. That place will hereinafter be referred to as the ''tavern.'' Tony Combs also operated a bus station at Vicco, a village in Perry County, close to the line between it and Knott County, and to which location we will hereinafter refer as the ''bus station.'' Refreshments were sold at the bus station, including alcoholic drinks; whilst at the restaurant none such were permitted, since in Knott County local option prevails.

Appellant and his brother, Harvey, went to Hazard in some part of the forenoon of March 29, 1945, and in the latter part of the afternoon, on their return trip from Hazard, he and his brother stopped the truck in which they were riding at the bus station, where they lingered and drank until between 5 and 6 P. M., when they, at the request of some friends, conveyed them to their homes on Yellowstone creek which was some eight miles distant from the bus station. Before departing from the station for that accommodating trip, appellant testified that he went down into a narrow alley between two buildings, one of which was the bus station, presumably in obedience to a call of nature, and when he arrived there a young man dressed in sailor uniform was also in the alley and that ''I couldn't see to tell whether he was a Navy boy, sailor boy or soldier boy or what he was, and I asked him what branch of the service he was in. That made him mad and he flew all over me and wanted to fight me. I told him I didn't want to fight that the law would get us and put us in jail if we fought and that was no good for both of us.''

It is shown uncontradictedly that the victim of appellant in this case, Alonzo Amburgey, resided in Bath County. He went in a bus to Vicco on the morning of the day referred to, and while there he obtained a shave and a haircut, and for some reason missed the last bus which would convey him to his home. Tony Combs and his wife were there at the bus station and Amburgey was well acquainted with them. Upon learning that he had missed the last bus to his home they proposed that he go home with them to the tavern, only some three or four miles distant, and spend the night at that place, they residing in some part of the building in which the restaurant was operated. He accepted that invitation.

Denny Combs, a brother of Tony, was the chief operator and manager of the restaurant at the tavern, but in the early part of the day referred to he locked the restaurant and went to and spent the day at the bus station. About 9 P. M. of that day Tony Combs, his wife, Mallie, his brother, Denny, and Amburgey left the bus station and in a short time arrived at the tavern and opened it up.

Almost immediately after their return Tony Combs and his wife left the tavern to feed some hogs belonging to him which were confined in a pen a short distance from the tavern. While they were gone (which was only some 10 or 15 minutes) two men and two girls came into the tavern and took seats at one of the tables. One of the young men, whose name was Sumner, also wore a sailor's uniform and both he and Amburgey were on leave from their duties with the U. S. Navy. Shortly after the four arrived, and after Tony and his wife had returned from their mission to feed the hogs, appellant and his brother came into the tavern and appellant began tantalizing Amburgey and engaging in more or less belligerent language, accompanying it with threats that "I want to whip me a sailor boy," and expressing his intention to whip Amburgey; also stating that, "I am going to blow the G—— d—— house up," and that "If you want any trouble here we have got it right in our pockets." Amburgey, Mrs. Combs, and perhaps some others who were then in the room, attempted to pacify him and told him they wanted no trouble, when Tony Combs, who was eating his supper in an adjoining room, spoke to him and requested that he go home and cease

his efforts to make trouble, his home being only 300 feet just across Breedings Creek from the tavern. Appellant was reluctant to do so as was also his brother, the latter of whom was, according to the witnesses, at least three-fourths drunk.

Finally appellant vacated the room, but his brother, Harvey, attempted to block the door when Mrs. Combs shut and locked it, thereby pushing Harvey to the outside. Those on the inside heard threats emanating from appellant, or his brother, or perhaps both, that they would go home and get their guns and blow the place up, or words to that effect. In a short while they did return and appellant knocked on the door after he and his brother, or one of them, made a similar threat. Finally Tony Combs opened the door and again commenced to persuade appellant to return to his home and cease his trouble making. Amburgey followed Combs and his wife out of the building and was himself engaged in persuading appellant to cease his belligerent conduct and his threats and return to his home, when appellant approached him as though he intended to inflict some harm on Amburgey, when the latter attempted to push him away, when according to that witness, he was stabbed just above the first rib on the left side causing his entrails to protrude. Appellant's victim grabbed himself where he was gashed and ran into the tavern. As quickly as possible he was conveyed to a doctor who gave him treatment, followed by his confinement in a hospital for fourteen days. His bowels were also punctured in two or three places and a knife wound inflicted on his left elbow. Such are the facts as disclosed by at least three witnesses for the Commonwealth, whilst others who did not witness the immediate difficulty testified to appellant's criminal and unprovoked conduct immediately preceding and following the altercation, as we have outlined above.

The appellant testified that when he entered the tavern Amburgey approached him and inquired, "Ain't you the same boy I saw down at Vicco?" to which the victim answered, "I just come from Vicco;" that immediately Mallie Combs "turned around to me and told me I have to get out, and before I could turn around they had me pitching me out." He then explained that the group to which he referred as so unceremoniously eject-

ing him, consisted of Amburgey, Sumner, the other sailor, and Tony Combs, and that after they had ejected him, he said: "Tony, you have run this place a long time. I am going to tear it up." He then testified that Tony began shoving him, in which some of the others joined, and backed him up against his truck parked close to the door, and that he loosened himself from them and started running. No witness supports him in his narration of what happened after he left the tavern voluntarily, and following his second return to the premises. Appellant, however, did testify that he had no knife, nor other weapon on that occasion, but he was overwhelmingly contradicted in that contention by the prosecuting witnesses, as will be seen from their testimony at the trial.

Harvey Hamilton also stated that appellant had no knife, but he had no personal knowledge of that fact and evidently made the statement from what appellant had told him. In all of that *alleged* pushing, shoving, and striking of appellant by the Commonwealth witnesses to whom we have referred, no bruises, scratches or wounds of any kind were inflicted upon appellant, and his entire testimony in the case is as incredulous and unreasonable as are the excerpts therefrom we have inserted supra. Neither do we find in the entire record any support for the contention that irrelevant and prejudicial evidence was introduced by the Commonwealth over appellant's objection. His counsel apparently conceived it to be his duty to object to practically every question that a witness was asked, an illustration of which is that he vigorously objected to Amburgey and others describing the character of wound that was inflicted upon appellant's victim, and to the efforts of those present to transport him to a doctor for treatment.

Neither do we find anywhere in the record that the court excluded relevant testimony offered by the appellant. It is true that in some few instances the court sustained the Commonwealth's objection to questions propounded by appellant's counsel, but in practically all, if not in every instance, the information sought to be obtained was wholly irrelevant on the issue of appellant's guilt or innocence. However, if it were otherwise, then this ground urged for reversal could not be considered because nowhere in the record was an avowal made as to

what the witness would testify, it being the universal rule that without such an avowal the question is unavailing.

Counsel also harps on the fact that Amburgey after receiving his wound while he was trying to avoid an assault by appellant, with no others participating, immediately went into the tavern and announced to Tony Combs that he was shot, which he testified that he so concluded, after discovering that his entrails were protruding, since the shot which he imagined he had received could have perhaps been fired from appellant's pocket and the report therefrom would have been deadened by the noise from a juke box which was running inside the tavern, the door to which was still open.

We refrain from further discussion of the evidence in this case, since that which we have already stated was and is amply sufficient, not only to submit the issue of appellant's guilt to the jury, but to sustain its verdict finding him guilty. Amburgey denied any meeting in the alley to which appellant testified, and it is quite apparent from the entire record that the story of that meeting was "hatched up" after the melee in which Amburgey was wounded. Appellant perhaps entertained some jealousy against enlisted men in the armed forces who were supplied with clothing and comforts which he did not possess. At any rate, the testimony indicates that he possessed an aversion toward sailors and which is evidenced by his threats hereinbefore recited.

Finding no grounds authorizing a reversal of the judgment, it is affirmed.